GORDON R. TATUM, JR. *v.*
GREGORY S. RICHTER

[No. 19, September Term, 1977.]

*Decided June 1, 1977.*

*Motion for reconsideration filed July 1, 1977; denied July 13, 1977.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*David L. Prestemon,* with whom were *Miller, Hall & Prestemon* on the brief, for appellant.

*Joseph J. D'Erasmo,* with whom were *S. Richard O'Day* and *J. Michael Talbot* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

This appeal, from a judgment entered by the Circuit Court for Montgomery County in favor of Gregory S. Richter, the plaintiff in an action of replevin brought in that court, involves a somewhat bizarre set of facts.

There came a time in August of 1971 when Richter decided to purchase a used 1971 Ferrari Daytona coupe for $17,500.00 from Gordon R. Tatum, Jr., a dealer in foreign cars. Tatum did not have a car in stock, but purported to locate one, which Tatum said he had found at Luigi Chinetti Motors, Inc., a Connecticut dealer or distributor. Tatum ascertained the model number of the car — 365GTB/4, and the serial number — 14115, and based on this information prepared an order form and a bill of sale dated 31 August 1971 showing that a used 1971 Ferrari Daytona, model number 365GTB/4, serial number 14115, had been ordered by and sold to Richter for $17,500.00, of which $15,000.00 was paid as a deposit. This documentation was required to support Richter's bank loan. Of the deposit $7,500.00 was represented by Richter's personal check dated 1 September 1971, and $7,524.10 was borrowed by Richter from his bank. On the face of Richter's check was the notation "1971 Ferrari #14115." This check was endorsed by Tatum. The bank cashier's check, also dated 1 September, drawn to the joint order of Richter and Internal Combustion Engines, the name under which Tatum conducted his business, bore the following restrictive endorsement:

> "The endorsement of this Cashier's Check by the payee constitutes an obligation to the Peoples Bank & Trust Company of Fairfax that the payee will record a first lien in favor of the Peoples Bank & Trust Company of Fairfax P.O. Box 6058

Alexandria, Virginia on one *1971 Ferrari Daytona* Identification No. *14115* titled in the name of *GREGORY S. RICHTER* in the amount of *$9,180.00* secured ·by *SECURITY AGREEMENT* dated *SEPT 1, 1971*" (italicized portion was handwritten)

The check was endorsed by Richter and Tatum.

Within a day or two, the car was delivered to Tatum. It seems to be conceded that the car which was delivered was a European version of the 1971 Ferrari Daytona coupe, intended for racing, and not for operation on highways. Although the odometer showed that it had been driven for 427 miles, it was regarded by the parties as a new, and not a used car.[1] Tatum took the position that it was not the car which Richter had ordered, and refused to deliver the car, saying that he would undertake to locate another car, despite the fact that Richter, according to his testimony, offered to pay the $2,500.00 balance of purchase price on delivery.

When Tatum failed to produce another car, Richter became concerned about his deposit.[2] There was ample evidence from which the trial court could have found that Tatum had adopted a stratagem to provide funds for the purchase of the car which he had ordered for his own use. In January, 1972, Richter brought an action in replevin, and without tendering the $2,500.00 unpaid balance of purchase price, posted bond and gained possession of the car.

In September, 1976, more than five·years later, the case finally came on for trial. From a judgment in Richter's favor

---

1. Richter testified that the car had "some mileage" on it, but could not recall the number of kilometers. The "427 miles" appears on the sheriff's return in the replevin action.

2. As it turned out, Richter's concern was fully justified. At the trial·of the case, Tatum testified that he had ordered the very car which is the subject of this litigation in Daytona Beach in January or February of 1971 from Luigi Chinetti. Tatum said that he had made a deposit at this time, but the car was not to be delivered until he paid the balance of the purchase price. He explained his inability to obtain another car for Richter by saying that he "had not been able to realize enough money to go out and buy it," nor did he ever offer to refund Richter's deposit. On cross examination Tatum acknowledged that he had been convicted of mail fraud in 1973, in an unrelated case involving two other foreign cars.

for the goods replevied and one cent damages and costs, Tatum appealed to the Court of Special Appeals. We granted certiorari before the matter was heard by that court.

The thrust of Tatum's argument is that Richter's possession of a bill of sale, identifying an automobile by model and serial numbers, did not entitle Richter to maintain an action in replevin for the possession of the car bearing those numbers when Richter admitted that it was not the type of car which he had ordered, and that he had not paid or tendered the balance of the purchase price.

We think that the short answer to this contention is that the parties modified their agreement: Tatum, by preparing the purchase order and bill of sale for a car identified by model and serial numbers and by accepting Richter's check, and Tatum and Richter, by negotiating the bank check bearing the restrictive endorsement. While it seems to us that the court below should have conditioned its judgment upon Richter's payment of the $2,500.00 balance, this can still be recovered by Tatum, because the filing of Richter's suit suspended the running of limitations, *Neel v. Webb Fly Screen Mfg. Co.*, 187 Md. 34, 48 A. 2d 331 (1946); *Lichtenberg v. Joyce*, 183 Md. 689, 39 A. 2d 789 (1944).

The trial court concluded, erroneously we think, that the matter was not controlled by the Uniform Commercial Code (the UCC), now Maryland Code (1975), Commercial Law Article §§ 2-101 *ff.*

Under the view we take of this case, the provisions of the UCC are controlling. Sections 2-102 and 2-105 provide that Title 2 applies to transactions in goods, including manufactured goods, which this was. There was compliance with the Statute of Frauds, required by § 2-201 in a "contract for the sale of goods for the price of $500 or more . . . ."

Section 2-202 provides:

> "Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement

with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

"(a) By course of dealing or usage of trade (§ 1-205) or by course of performance (§ 2-208); and

"(b) By evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."

We regard the prior oral negotiations of the parties as having been integrated into the written agreement, evidenced by the purchase order and the bill of sale, which specified the make and year of the car, the model number and the serial number. Under UCC § 2-106 (2), the car delivered to Tatum conformed to the contract. The only inconsistency was that the car was described in the purchase order as "used"; the car which was delivered was new.[3] We hold that Tatum modified this provision, as permitted by § 2-209, when he induced Richter to accept the serial number of a car which Tatum himself had ordered, since no consideration was required, and modification may be established by a course of conduct, *R. T. Woodfield, Inc. v. Montgomery County Board of Education*, 252 Md. 33, 38, 248 A. 2d 895, 897-98 (1969). Moreover, UCC §§ 2-601 (b) and 2-606 (1) (a) gave Richter the right to accept a car which did not conform to the purchase order had delivery been tendered, *Fred J. Miller, Inc. v. Raymond Co.*, 265 Md. 523, 527, 290 A. 2d 527, 529 (1972); *Webb v. Chevy Chase Cars, Inc.*, 259 Md. 284, 287, 269 A. 2d 810, 812 (1970).

Although the UCC has substituted a flexible contractual approach for the more rigid concept of title to which the Uniform Sales Act adhered, *Wilke, Inc. v. Cummins Diesel*, 252 Md. 611, 615, 250 A. 2d 886, 889 (1969), UCC § 2-401 (1)

---

3. We do not rely on either the fact that the odometer showed some mileage, or that Tatum's testimony established that he was the prior owner.

provides that title does pass when the goods are identified to the contract. The identification here was contained in the purchase order and bill of sale which Richter had in his possession, thus giving him title under § 2-401 (3) (a), although Tatum retained the goods, *compare Metropolitan Auto Sales v. Koneski,* 252 Md. 145, 155, 249 A. 2d 141, 147 (1969). It seems obvious that Tatum intended that Richter should have title; without it, bank financing could not have been obtained.

It is clear to us that Tatum's conduct did not meet the standards of good faith imposed by § 1-201 (19): "Good faith means honesty in fact in the conduct or transaction concerned," *Clark v. Zaid, Inc.,* 263 Md. 127, 129, 282 A. 2d 483, 485 (1971), *see* 1 R. Anderson, Uniform Commercial Code (2d ed.) §§ 1-201.59, 1-201.60 at 103-04 (1970). And under § 2-103 (1) (b), when the seller is a merchant, "honesty in fact" has the additional meaning of "the observance of reasonable commercial standards of fair dealing in the trade." Once the car was identified to the contract, § 2-716 (3), Richter had a right of replevin, because he was unable to effect cover, and there was no other way to protect himself against loss of his deposit. It is more than likely that Tatum could have insulated himself from the loss of the car by returning the deposit.

*Judgment affirmed, costs to be paid by appellant.*