THE MECHANICS NATIONAL BANK OF WORCESTER *vs.*
SADIE A. GAUCHER, administratrix, & others.[1]

Worcester.    January 22, 1979. — March 7, 1979.

Present: HALE, C.J., GRANT, & KASS, JJ.

*Sale,* Delivery of goods. *Security Interest. Words,* "Proceeds."

A mobile home generally is property of a nature requiring special
handling to enable a buyer to take possession and thus subject to
G. L. c. 106, § 2-401(2), which requires physical delivery for the
passage of title from the seller to the buyer. [146-147]
No sale of a mobile home occurred, nor did a dealer in mobile homes
acquire any right of payment generating "proceeds" reachable by
a bank which, as a secured lender, had financed the dealer's acquisi-
tion of the mobile home, where the prospective buyer, who had
made a down payment, never tendered the balance of the purchase
price; the dealer never notified the prospective buyer that the home
was at her disposition or tendered it to her; earlier action by the
bank itself in asserting its security interest in the home indicated
its own conviction that no sale had occurred; and no termination of
the bank's security had ever been delivered to the credit union that
was to finance the prospective buyer's purchase of the home. [147-
149]

CIVIL ACTION commenced in the Superior Court on
April 22, 1976.

The case was heard by *Brogna,* J.

*Burton Chandler* for the plaintiff.

*Henry J. Lane* for Sadie A. Gaucher, administratrix.

KASS, J. In this case the plaintiff bank (Bank), a secured
party, seeks to reach certain funds which it characterizes
as "proceeds"[2] from the sale of personal property, a mo-

---

[1] Westover Credit Union, Elio C. Bellucci and Wauwinet Develop-
ment Corporation.

[2] G. L. c. 106, § 9-306(1).

bile home, in which it had a security interest. Whether the Bank can do so raises questions under arts. 2 and 9 of the Uniform Commercial Code, G. L. c. 106 (the Code), and depends, in our view, on whether the Bank's debtor, a mobile home dealer, completed the sale of the mobile home to the proposed buyer.

The Bank's complaint sought a declaratory judgment as to who was entitled to $14,000 which was in the hands of counsel to the source of the buyer's financing. The trial judge referred the case to a master. The defendant filed objections to the master's final report, as well as a motion to modify the master's report, to "confirm" the report as modified, and to enter judgment on the report as modified. The trial judge entered judgment declaring the rights of the parties as follows: (1) the funds over which the parties contended belonged to the estate of the buyer of the mobile home, together with interest at the rate of 5¼ %; and (2) the mobile home belonged to the dealer and the Bank, as a secured party, continued to have a security interest in it.

From this judgment, the Bank appeals. We think the judge was right.

We derive our facts from the master's subsidiary findings of fact, which we "are required to treat . . . as binding unless they are mutually inconsistent, contradictory, plainly wrong or vitiated in view of the controlling law." *Selectmen of Hatfield* v. *Garvey*, 362 Mass. 821, 825 (1973). These having constituted the basis for the master's general findings and conclusions, it is our duty to draw our own inferences and conclusions of law from his subsidiary findings. *Wormstead* v. *Town Manager of Saugus*, 366 Mass. 659, 660 (1975).

The Bank is The Mechanics National Bank of Worcester which financed Wauwinet Development Corporation (Wauwinet), a dealer in mobile homes (also referred to in the record as modular homes), by taking security interests in Wauwinet's inventory. The Bank obtained a per-

fected security interest in the mobile home in question.[3]

Wauwinet entered into an agreement on July 29, 1974, to sell the mobile home to one Charlene M. Garneau for $16,500. Garneau made a $2,000 down payment, and we infer from the record that the purchase and sale agreement was contingent on Garneau's being able to obtain financing for the balance of the purchase price. In due course Garneau arranged financing with Westover Credit Union (the Credit Union). About five and a half months later, on January 14, 1975, Garneau executed a promissory note payable to the Credit Union for $18,675, an amount which covered prepaid interest, finance charges, insurance costs and attorneys' fees. She executed a second note for $7,000 to finance acquisition of the land on which she was going to locate the mobile home and also executed a mortgage to the Credit Union to secure these loans.[4] The mortgage was never recorded. Simultaneously with Garneau's execution of the loan papers, which included orders that the loan proceeds be paid to the defendant Mr. Elio C. Bellucci, who acted as attorney for the Credit Union, Wauwinet executed and delivered to Garneau a bill of sale to the mobile home.

On February 4, 1975, Garneau made her first monthly loan payment to the Credit Union. Five days later she died[5] and at that time, the Bank's complaint acknowledges, Wauwinet had not yet made actual physical delivery of the mobile home. Counsel for the Bank informed us at argument that the mobile home has remained on Wauwinet's lot to this day. The Credit Union obtained payment of Garneau's debt to it from the proceeds of a life insurance policy it had purchased on her life.

---

[3] The Bank's financing was not according to a continuing dealer floor plan arrangement. Rather the Bank financed each mobile home separately. So, for example, Wauwinet signed a separate note and security agreement when it obtained financing from the Bank to acquire the mobile home in question from the manufacturer.

[4] Somewhat mysteriously, the mortgage was for $26,325, more than the sum of the notes.

[5] The defendant Gaucher is administratrix of the estate of Garneau.

An inquiry as to whether or not the Bank's security interest in the mobile home metamorphosed into a security interest in proceeds begins with § 9-306 of the Code. Under this statute the term "proceeds" includes whatever is "*received* when collateral . . . is *sold,* exchanged, collected or otherwise *disposed* of. The term also includes the account arising when the right to payment is earned under a contract right" (emphasis supplied). G. L. c. 106, § 9-306(1). Manifestly, Wauwinet did not "receive" anything from Garneau, except the original deposit, since what the Bank now pursues is the money which the Bank argues Wauwinet was entitled to receive from her. Equally obviously, the collateral was not "disposed of" since the mobile home stayed on Wauwinet's lot. Disposition implies a permanent transfer of possession. *Estate of Rothko,* 84 Misc. 2d 830, 864 (N.Y. Surr. Ct. 1975). We are remitted, therefore, to considering whether the goods were "sold" or whether Wauwinet earned a right to payment.

A "sale" consists in the passing of title from the seller to the buyer for a price. G. L. c. 106, § 2-106(1). In this same definition, the Code refers to § 2-401, which instructs us in an introductory sentence that the rights and obligations of parties under the Code should be sorted out without traditional dependence on the concept of title.[6] A similar statement of policy appears in the comment to § 2-101: "The arrangement of the present Article is in terms of contract for sale and the various steps of its performance. The legal consequences are stated as following directly from the contract and action taken under it without resorting to the idea of when property or title passed or was to pass as being the determining factor." 1 Uniform Laws Annot., U.C.C., Comment to § 2-101

---

[6] G. L. c. 106, § 2-401, and see particularly in this regard the first paragraph of the Massachusetts code comment to § 2-401 (Mass. Gen. Laws Ann., Comment to c. 106, § 2-401 [West 1958]) and comment 1 of the official comments (1A Uniform Laws Annot., U.C.C., Comment 1 to § 2-401 [Master ed. 1976]).

(Master ed. 1976). Since, however, the passing of title may offer clues to the unraveling of the puzzle the litigants pose, we examine their positions under § 2-401.

Unless parties explicitly agree otherwise (the record does not favor us with the terms of the agreement between Wauwinet and Garneau, and so we must proceed on the basis that there is no explicit agreement), ". . . title passes to the buyer at the time and place at which the seller *completes* his performance with reference to the *physical delivery of* the goods . . ." G. L. c. 106, § 2-401(2) (emphasis supplied).

Before determining, however, whether physical delivery of the goods took place, we must pause to consider the impact of § 2-401(3) of the Code, which provides:

"Unless otherwise explicitly agreed where delivery is to be made without moving the goods

"(*a*) if the seller is to deliver a document of title, title passes at the time when and the place where he delivers such documents; or

"(*b*) if the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting."

As we have noted, the record is silent about what the parties may have agreed. A mobile or modular home of the kind we have here is an item of considerable bulk and is unlike a tractor or car, which a customer can drive away. With property of the latter kind, courts have applied § 2-401(3). *International Harvester Credit Corp.* v. *Associates Financial Servs. Co.*, 133 Ga. App. 488, 493-494 (1974). *Tatum* v. *Richter*, 280 Md. 332, 337 (1977). It is not to be imagined that Garneau, a consumer, could simply have dropped by the dealer to pick up a house. We think that where property is of a nature which requires special handling to enable the buyer to take possession, § 2-401(3) is inapplicable and § 2-401(2), requiring physical delivery, does apply, except in cases where the purchase price has been paid and the seller is holding the goods for the convenience of the buyer. See, e.g., *Integrity Ins. Co.* v. *Ma-*

*rine Midland Bank-Western,* 90 Misc. 2d 868 (N.Y. Sup. Ct. 1977).

Unless otherwise agreed, "the place for delivery of goods is the seller's place of business." G. L. c. 106, § 2-308. Although a usage of trade may be tantamount to "otherwise agreed,"[7] there is no finding in the master's report from which we could conclude whether mobile home dealers generally deliver their product at the customer's site or at the seller's place of business.[8] Wauwinet, therefore, could have made physical delivery at its place of business to complete the sale. Particularly in the light of the commercial facts later recited in this opinion, we are of the opinion that it failed to do so. While delivery and transfer of possession are not synonymous, *Bowman* v. *American Home Assur. Co.,* 190 Neb. 810, 813-814 (1973); *Integrity Ins. Co.* v. *Marine Midland Bank-Western, supra* at 870-871, nonetheless, the "physical location of contract goods is a significant indicator of statutory rights, particularly when third-party interests are at stake." Jackson & Peters, Quest for Uncertainty: A Proposal for Flexible Resolution of Inherent Conflicts Between Article 2 and Article 9 of the Uniform Commercial Code, 87 Yale L.J. 907, 912 (1978). Wauwinet at all times had the goods.

The Bank urges that delivery of the bill of sale was the talisman of title and, hence, entitlement to the proceeds of the sale. But to impart significance to the document of title takes us back to § 2-401(3), which we have already concluded does not apply.

Analysis of the title question, therefore, points to retention of title to the mobile home by Wauwinet. But, in view of the Code's renunciation of reliance on title, which we noted above, we rely for resolution of the controversy on factual signposts.

---

[7] 1 Uniform Laws Annot., U.C.C., Comment 4 to § 2-308 (Master ed. 1976).

[8] See G. L. c. 106, § 1-205(6), which requires notice to an opposing party of an intent to prove trade usage.

A series of commercial facts etches the inchoate nature of this transaction:

1. Garneau never tendered, much less paid, the balance of the purchase price. In this respect the instant case differs from other specimens of the genre in which full consideration had been paid, either in cash or in paper, and the dispute was between rival secured parties or persons claiming the right to possess property which was the subject of a security interest. See, e.g., *International Harvester Credit Corp.* v. *Associates Financial Servs. Co., supra; Tatum* v. *Richter, supra; Integrity Ins. Co.* v. *Marine Midland Bank-Western, supra*; Skilton, Buyer in Ordinary Course of Business Under Article 9 of the Uniform Commercial Code, 1974 Wis. L. Rev. 1, 76-88.

2. Wauwinet never notified Garneau (or her estate) that the mobile home was at her disposition and that Wauwinet proposed to tender it. G. L. c. 106, § 2-503(1).

3. The security agreement which Wauwinet entered into with the Bank provided that "the Borrower will not sell or offer to sell or otherwise transfer or encumber the collateral or any interest therein without the prior written consent of the Bank." The record does not suggest this ever happened. To the contrary, within days after Garneau died, the Bank took steps under § 9-504 of the Code to realize on its security interest in the mobile home, demonstrating the conviction of the Bank that the collateral belonged to Wauwinet.

4. No termination of the Bank's security interest was delivered to Mr. Bellucci. Obviously, the Credit Union would have insisted on receiving a termination statement.

However close the parties may have been to closing their transaction, the facts are that the deal never closed. There was not a completed sale nor a right to payment[9] which generated proceeds for Wauwinet or the Bank, as its secured lender, to follow.

*Judgment affirmed.*

[9] The Bank, no doubt, had a security interest in Wauwinet's contract right (§ 9-106) against the Garneau estate for breach of the sales con-

---

tract, but such action would now be barred under the short statute of limitations governing claims against estates. G. L. c. 197, § 9.