Fremont-Smith, J.
In this case, the plaintiff (“E.D.S.”) was an unsuccessful bidder in a 1981-82 procurement conducted by the Commonwealth of
Massachusetts for a sophisticated, computerized data processing system for the Department of Public Welfare (“DPW”), called the Medicaid Management Information System (“MMIS”). After defendant ("S.D.C.”) was awarded the contract, plaintiff, on June 4, 1982, filed this action, alleging that S.D.C. had procured the contract by means of bribery and fraud, and should have been disqualified from the award of contract. Plaintiff contends that, had this occurred, E.D.S. would have been the successful bidder and been awarded the contract, so that it was wrongly deprived of the millions of dollars of profits it would otherwise have earned, which should now be awarded as damages and trebled. In the alternative, E.D.S. contends that, even had it not been the successful bidder, if it had known that attempts were being made to skew the selection procedure in favor of the S.D.C. by way of defendant’s unfair and deceptive trade practices, it would not have expended a large sum of money to pursue its own bid, so that it should now be reimbursed thrice the amount of its bid expenditures, plus attorney fees and costs.
After considerable discovery, the case was tried before a Master who, after a twenty-four day trial, issued his findings of fact, conclusions of law and decision[1] in favor of S.D.C., on June 14, 1996, which was not filed with the Court until January 14, 1998. Following the filing of E.D.S.’s objections to the Master’s findings, S.D.C.’s motion to confirm his award, and the other motions listed above,[2] the Regional Administrative Justice for Suffolk County assigned the matter to me for further proceedings, by order dated April 22, 1998. After supplemental briefs and appendices were filed, the Court heard oral argument on the pending motions on July 8, 1998.
The Legal Standard of Review
Massachusetts Rules of Civil Procedure, Rule 53(h)(1) provides that:
The Court shall accept the Master’s subsidiary findings of fact unless they are clearly erroneous, mutually inconsistent, unwarranted by the evidence before the Master as a matter of law or are otherwise tainted by error of law.
As stated in 8 J.W. Smith & H.B. Zobel, Rules Practice, §53.11 (1977).
subsidiary findings of fact must stand, unless the court concludes them to be clearly erroneous or unless on the face of the evidence, as reported or summarized, the underlying evidence did not legally suffice to warrant them.
On the other hand, even though the court may conclude that the subsidiary findings are not clearly erroneous (and are thus impervious to attack), it may nonetheless reach its own conclusions of fact. That is, so long as the master arrived at his ultimate conclusions ‘by inference solely from his subsidiary findings’ the trial court may disregard *692 the master’s conclusions; moreover, the appellate court may ignore the trial court’s conclusions as well.
See Bishay v. Foreign Motors, Inc., 416 Mass. 1, 12 (1993) (“The Court may draw its own inferences from the Master’s subsidiary findings”); USM Corp. v. Marson Fastener Corp., 379 Mass. 90, 92 (1979) (where the Master’s ultimate conclusions were based solely on subsidiary findings of fact, it was open to the Supreme Judicial Court, as it was to the trial judge, to reach its own conclusions from the Master’s findings); Jet Spray Cooler, Inc. v. Crampton, 377 Mass. 159, 165 (1979) (where a Master reports his subsidiary findings, a reviewing in court, like the judge below, may draw its own inferences and come to its own conclusions from the Master’s subsidiary findings); Jones v. Wayland, 374 Mass. 249, 255 (1978) (“indeed, where subsidiary findings are reported by the Master, both the trial judge and the Appellate Court are obligated to draw their own inferences from these findings”); Wormstead v. Town Manager of Saugus, 366 Mass. 659, 660 (1975) (same); Mechanics Nat. Bank of Worcester v. Gaucher, 7 Mass.App.Ct. 143, 144 (1979) (where Master’s subsidiary findings of fact constitute a basis for Master’s general findings and conclusions, it was the duly of the Appeals Court to draw its own inferences and conclusions of law from the Master’s subsidiary findings); E.F. Semas Trucking, Inc. v. Mayor of Taunton, 7 Mass.App.Ct. 907, 908 (1979) (subsidiary findings of Master are binding unless they are mutually inconsistent or plainly wrong; however, Court must draw its own inferences from findings to reach its conclusions).
Here, the Master’s subsidiary findings[3] were based upon a careful review of the evidence submitted to him at trial, and are not clearly erroneous. Thus, in these subsidiary findings, he found, inter alia, that Robert Clark, between January 1981 and June 30, 1982, was the Commonwealth’s Consultant/Project Director, functioning as a technical advisor to the Medicaid Division, and was a key person in the Commonwealth’s procurement efforts. He was responsible for planning, hiring and directing the MMIS[4] project for the Commonwealth and had been delegated the responsibility for preparing the ADP[5] and RFP,[6] having a staff of twelve people under his direction. (A10, para. 35.) James R. Camicia was a consultant to the DPW and assisted in the procurement and selection process (All, para. 40.) James Errico was in charge of S.D.C.’s marketing efforts, and was responsible to see that the proposal had proper response from the Commonwealth. Part of his duties was to obtain information relative to the Commonwealth’s MMIS contract. (A12, para. 42.) Edward J. Doyle was an S.D.C. officer in charge of its division responsible for its Medicare and Medicaid procurement and operational activities, including S.D.C.’s efforts to procure the Commonwealth’s MMIS. (Al 1-12, para. 41.)
There was an initial luncheon meeting in October, 1984 between Clark and S.D.C.’s Doyle and Errico at Stella’s restaurant in Boston, at which Clark’s employment plans were discussed and it was suggested that S.D.C. might be interested in employing him (A1.3, para. 45; A15, para. 53.) At that time, bidders were not prohibited from having contacts with persons employed by the Commonwealth in connection with the MMIS concerning possible employment. After the RFD was drafted and sent out in early November, 1981, however, such contacts between bidders and Commonwealth employees were prohibited and had to be reported. (A15-18, paras. 54-56, 61.) (Id.) S.D.C. was aware of the prohibition. (A18, para. 61.)
The RFP as originally drafted provided that a violation of this no-contact provision would be cause for rejection of a bidder’s proposal. About this time, Clark, while not being shown to have caused a change in the regulations to provide that a violation of this condition would no longer be sufficient to automatically cause the Commonwealth to reject a bidder’s proposal, was at the very least aware of the amelioration of this requirement. (A16-18, paras. 55-60.)
During the time when the Board was evaluating the bids, between January and late February, 1982, Clark again had lunch with S.D.C.’s Errico at the Marliave restaurant in Boston, at which Clark’s possible employment with S.D.C. was again discussed. (A18, para. 63.) In spite of the RFP’s prohibition of such contacts and the requirement that they be reported, he did not do so. In October 1982, after Clark had accepted a position with the MBTA, he had another dinner meeting with S.D.C. personnel at Schroeder’s restaurant, at which S.D.C. expressed concern that the Commonwealth had not replaced him with a full-time project director, which was making it difficult for S.D.C. to conclude satisfactorily its negotiations. (A19, para. 66.)
Soon after January 14, 1982, Cassedy, an employee of the Commonwealth who “had the ability to influence a great number of activities, even those for which he was not directly responsible” (All, para. 37; A20, para. 71), received a contingent job offer from S.D.C. contingent oh S.D.C. winning at least one of the MMIS or PAID[7] contracts from the Commonwealth. (A21, paras. 71-72.) Cassedy rejected the offer and reported it to the Board, consistent with the RFP which forbad any firm that submitted a proposal from initiating contact with any employee of the Department. The Board, which was then unaware of S.D.C.’s prior overtures to Clark, found that no action disqualifying S.D.C. as a bidder was warranted. (A21-22, paras. 73-78.)
On February 17,1983, the day of oral presentations by the bidders, Errico of S.D.C. called Camicia, a consultant to the DPW, who had told Errico he was a technical advisor to the Board and could influence the contract award. (A23, para. 81.) On February 17, *693 Errico told Camicia he could get Camicia any type of consulting work with S.D.C. that Camicia wanted. (A23, para. 83-84.) When Camicia questioned how he could rely on Errico’s offer of a bribe, Errico told Camicia that this was how S.D.C. had procured the MMIS project. (A24-25, paras. 84-89.) Errico further told Camicia to pretend the conversation had not taken place. (A24, para. 87.) Camicia reportéd these overtures to the authorities, and, at the request of the FBI, tape-recorded a conversation between himself and Errico on February 28, 1983, in which Errico offered to set up a meeting at an out of the way location for the purpose of conveying assurances to Camicia that he could get employment or consulting work from S.D.C. in exchange for using his influence to help S.D.C. obtain the MPACS[8] contract. When Camicia asked Errico how he could be assured Errico would come through with the job offer, Errico replied, “look, I’ve been doing this for Doyle[9] for seven years, and I’m the guy that booked the MMIS project in Massachusetts.” (A24-25, paras. 88-89.)
The procurement process for award of the contract began December 17, 1980 and continued through June 22, 1982. Clark’s project staff primarily worked on the technical sections of the RFP. (A26, para. 97.) The Board approved the RFP on October 23, 1981, before it was released to bidders, with a view to meeting the September 30, 1982 “Schweiker Amendment’’[10] deadline for federal funding. (A28, para. 105.)
A consulting group hired by the state warned the Commonwealth in December 1982 that the procurement “would be fiercely contested.” (A30, para. 119.) Proposals were solicited from bidders, and Clark participated in formulating the.methodology used by the project team to evaluate the proposals. (A30-31, paras. 120, 127.) He was also part of the audit team which reviewed the project team’s evaluations and prepared summaries of the project team’s reviewmeetings, which he presented for consideration and review by the Board. Id. After it was determined that a bidder must have scored at least 420 points on its technical proposal to be considered for the business proposal portion of the evaluation, Clark determined that the four top bidders, which included the plaintiff and defendant, were so close in their technical scores that the pricing proposals would determine who the successful bidder was to be. (A33-34, paras. 135, 139.) Clark told E.D.S. that it appeared the low bidder would win and E.D.S. was not the low bidder. He also threatened that if E.D.S. caused any problems as a result of an award to S.D.C., other E.D.S. contracts with the Commonwealth could be in jeopardy. (A34, para. 142.)
As it had been determined by the Board that the selection among the top several bidders would be based upon the best financial bid, the Commonwealth informed the prospective bidders that the anticipated base level would be 17 million claims per year, and required each bidder to bid a “per claim” processing price for each of thirteen specified claim volumes ranging from 11,900,000 to 22,100,000 claims per year. (A35-36, paras. 147-148.) As stated, the mid-range or “base rate volume” was estimated to be 17 million claims. The Commonwealth used a confidential bid formula to evaluate the bid prices, and bidders were not to be informed how various claims levels would be evaluated. (A36, para. 150.) Furnishing the evaluation criteria to a bidder prior to the time it submitted the bid “would give the bidder a tremendous advantage, since it could submit its lowest prices at the five claim levels which carried the greatest weight.” (A36, para. 151.)
As it turned out, while E.D.S. bid a slightly lower price at the mid line of 17 million claims, S.D.C.’s prices which it bid for the two claim volumes above and the two below 17 million resulted in S.D.C.’s bid being lower. After some additional oral presentations and investigation,[11] a review committee convened by David Bartley (Secretary of Executive Office of Administration and Finance) recommended on May 24, 1982 that the Selection Committee’s vendor selection be confirmed, and on June 2, all bidders were informed of the Commonwealth’s selection of S.D.C. On June 4, 1982, plaintiff commenced this action in Suffolk Superior Court. (A38, para. 158, A45, para. 187.)
FINDINGS AND RULINGS
This Court concludes, based upon the joint record appendix submitted by the parties in connection with these motions, that the Master’s subsidiary findings, summarized above, were not clearly erroneous, but were, on the contrary, based upon substantial evidence.
The role of this Court, then, is to determine whether, based on the subsidiary findings, the Master’s “ultimate findings” should be confirmed, bearing in mind that, as stated in 8 J.W. Smith & H.B. Zobel, Rules Practice, Section 53.11 (1977), quoted above, even where subsidiary findings are not clearly erroneous, a trial judge may nonetheless reach his or her own ultimate conclusions.
In his “ultimate findings,”[12] the Master found that Errico, in his conversations with Clark, was speaking as an agent of S.D.C., but had designated himself as a “consultant” of S.D.C. in the hope Errico would not be deemed to be S.D.C.’s agent; that on the occasions Errico and Clark discussed Clark’s future employment opportunities (A46, paras. 2-4), Errico “not only made an overture to Clark, but a commitment to locate Clark with an appropriate job if S.D.C. was awarded the contract” (A47, para. 7); that at the time of the second luncheon at the Marliave restaurant between Clark and Errico, the Commonwealth’s restriction on contacts with Commonwealth personnel was in effect and contacts were prohibited except upon approval of the project director, but that, nevertheless, Clark’s possible employment at S.D.C. was discussed and an offer was made by Errico (A47, para. 8); that Clark, without *694 justification, failed to report this job offer; that “knowledge as to the location and width of the weighted segment [in the price bidding formula] would be of tremendous value to a bidder” (A49, para. 13) and that, while E.D.S. had no such knowledge, “S.D.C., on the other hand, either anticipated, or knew, that the weight would be given not only to the 17 million base level, but at the two volume levels below and the two volume levels above the 17 million base level, because that is where it placed its lowest price per claim.” (A49-50, paras. 14-15.)
Although the Master, in his subsidiary findings, had found that Clark “was responsible for planning, hiring and directing the MMIS project for the Commonwealth” (A10, para. 35), that “the Board delegated to Clark the responsibility for preparing the ADP and the RFP” (A10, para. 35), that Clark “participated in formulating the methodology used by the project teams to evaluate the [technical] proposals” (A31, para. 127) and recommended the composition of the project teams (id.), that Clark was part of an audit team which reviewed the project team’s evaluations (id.) and had prepared summaries of those team’s review meetings (id.), and although the Master concluded in his ultimate findings that S.D.C., unlike E.D.S., “either anticipated or knew” of the formula to be employed for evaluating the price bids (A49-50, paras. 14-15), the Master nevertheless, in his ultimate findings, declined to infer that Clark had supplied S.D.C. with such insider information, but rather concluded “it could be equally true that S.D.C. made a good guess, and E.D.S a bad guess as to how the weighting would be applied.” (A50, para. 18.)
Although certainly a close call, as to which the appellate courts of the Commonwealth may well draw a different inference based upon a preponderance of the evidence, this Court will not substitute its judgment so as to draw an ultimate inference in this regard contrary to that of the Master, who heard the testimony of the witnesses over the course of a lengthy trial. While the Master found that Clark had been “bribed” (A54, para. 35), and did not rule out the possibility that Clark had knowledge of the bidding formula and conveyed it to S.D.C., he pointed out (A17, para. 17) “there is no evidence as to who prepared the formula, or whether or not Clark had access to it prior to the submission of bids or at any time prior to the opening of bids." The plaintiff has not called to this Court’s attention, anywhere in the voluminous record appendix filed with this Court of the trial proceedings, any testimony or any exhibit which would indicate that the Master’s finding in this regard was clearly erroneous. While, particularly in view of Errico’s admission to Camicia (in conjunction with Errico’s attempt to bribe Camicia) that such bribery was how S.D.C. had procured the contract at issue (A24-25, paras. 87-89) this Court (or an appellate court) might well draw a different ultimate conclusion based upon all the evidence of nefarious conduct by S.D.C. (much of which was directed specifically at Clark, and was not reported, but was, instead, covered-up by Clark) this Court declines to second-guess the Master in this regard, or in his further finding that, even had S.D.C. been disqualified, it was not proven that E.D.S would have been the successful bidder.
An even more difficult question, however, is raised by plaintiffs alternative claim that, should this Court decline to alter the Master’s ultimate findings (to the effect that S.D.C.’s procurement of insider information from Clark was unproven, and that, even had such proof been present, it was not shown that E.D.S would have otherwise been awarded the contract) E.D.S., at the very least, should be awarded its bid preparation expenses because it would not have pursued the bid process had it known that its closest competitor was engaged in dishonest attempts to skew that process.
In this regard, the Master made no subsidiary findings, but simply concluded “that the bribe offer, in the light of all my other findings, does not entitle the plaintiff to recover such damages from the defendant.” (A56, para. 37.) He did, however, in apparent anticipation that a reviewing court might come to a different conclusion, go on to state “if E.D.S. is entitled to costs and expenses in connection with the preparation and filing of its bid for the MMIS System which I have concluded it is not, it is entitled to damages in the amount of $235,625.” (Id.)
Although no testimony was proffered at trial one way or the other as to whether or not E.D.S. would have pursued the bid process had it known that S.D.C. was attempting to subvert that process by unfair and deceptive trade practices, this Court concludes, as a reasonable inference based on all of the Master’s subsidiary findings, that it is extremely unlikely that any rational bidder such as E.D.S. would have expended over $200,000 to pursue a lengthy and time-consuming bid process had it known that its closest competitor was engaged in pervasive behind-the-scenes maneuvers to subvert, i.e., to “rig,” the process, regardless of whether those endeavors were ultimately successful. ]n light of the Master’s express findings that S.D.C. did attempt to bribe Commonwealth employees including Clark, who was the person most immediately involved with the entire procurement process for this contract, and the Master’s findings that S.D.C., in concert with Clark, took steps to prevent any disclosure of those on-going unfair and deceptive trade practices, the Court infers and therefore finds that, more probably than not, E.D.C. would not have incurred its substantial bid expenses had S.D.C. not succeeded in covering up the unfair and deceptive trade practices which were found by the Master. (A54, paras. 35-36.) See Fraser Engineering Co, Inc. v. Desmond, 26 Mass.App.Ct. 99, 104 (1988) (there was a sufficient basis for the trial court’s finding of a causal relationship between defendant’s unfair trade prac *695 tices and plaintiffs incurrence of legal fees, which, it could be inferred, would not have been incurred but for defendant’s unfair trade practices). See also Paul Sardella Constr. Co. v. Braintree Housing Authority, 3 Mass.App.Ct. 326, 334 (1975), affirmed, 371 Mass. 235, 243 (1976). There, a housing authority withdrew its award of a construction contract without following the procedure mandated by statute. The Appeals Court pointed out that the “fair competition for bidders of public works act” (G.L.c. 149, §§44A-44L) was intended to establish
an honest and open procedure for competition for public contracts and, in so doing, places all general contractors and subbidders on an equal footing in the competition to gain the contract. Interstate Engr. Corp., supra&t 758. The honest and open procedure for competition among the various bidders that is one of the fundamental objectives of the competitive bidding statute must necessarily entail fair consideration of all the submitted bids in accordance with the applicable sections of the statute. We hold that where such consideration has not been given by public contracting authorities, in violation of statutory provisions, the proper measure of recovery is the reasonable cost of preparing the bid.
Id. 332-33. The Court concluded, at 334:
The number of bidders, and thus the range of choice available to an awarding authority, may well be reduced if it were to be assumed by prospective bidders that such an authority would not abide by the applicable statutes in making its awards. As the court stated in Heyer Products, Co. v. United States, 140 F. Supp. 409, 412 (Ct. Cl. 1956), ”[n]o person would have bid at all if he had known that the cards were stacked against him.”
Similarly here, this Court concludes that E.D.S. would not have bid at all if it had known that the cards were stacked against it, and that, unlike the situation in Jet Line Services, Inc. v. American Employer’s Insurance, 404 Mass. 706 (1989) (where the unfair trade practices were not shown to have caused any adverse effect on the plaintiff), E.D.S. has shown that, more probably than not, it has at least suffered damages in the amount of its bid expenditures as a result of S.D.C.’s dishonest conduct and concealment thereof. In view of the Master’s findings, which indicate that S.D.C.’s attempted bribery and concealment thereof was not an isolated instance, but was part of a persistent course of conduct, which was calculated not only to unfairly subvert the selection process, but to conceal this subversion from E.D.S. and others, this Court concludes that E.D.S. was adversely affected by S.D.C.’s wilful, unfair and deceptive trade practices in the amount of its bid costs, as found by the Master, and is entitled to treble damages and attorney fees pursuant to G.L.c. 93A, §11.
ORDER
Accordingly, S.D.C.’s “Motion to Adopt the Master’s Report and Enter a Judgment” is ALLOWED, except with respect to the Master’s ultimate finding that E.D.S. was not entitled to an award of damages for its bid costs, as to which finding plaintiffs motion is DENIED. Plaintiffs “Motion to Confirm Master’s Report as Modified” is DENIED, except to the extent that the Court rules that E.D.S. is entitled to an award of treble damages for its bid costs, and to an award of attorney fees and costs. The Master’s report, as so modified, is confirmed. E.D.S.’s “Motion for Judgment” is ALLOWED with respect to paragraph two of said motion, and DENIED with respect to paragraph one.
Judgment shall enter in favor of E.D.S. Federal Corporation against System Development Corporation in the sum of $706,875 plus interest and the costs of this action.
E.D.S. may serve a motion for an award of reasonable attorney fees, together with any supporting affidavits, within thirty days of its receipt of this Order, and S.D.C. may serve any opposition papers on E.D.S. within twenty days of receipt of E.D.S.’s motion papers, following which E.D.S. will promptly file the entire motion package with the Court, and arrange, with my clerk, a time for hearing which is mutually convenient to the parties.[13]

 These are found in the “Parties Joint Appendix” (hereinafter, "A") at A1-A57.

 The pending motions are identified in the title to this memorandum of decision supra.

 The Master’s subsidiary findings are found at A3-A46, and his “ultimate findings” at A46-A57.

 Medicaid Management Information System.

 Automated Data Processing.

 Request for proposal.

 PAID is described as an electronic funds transfer procurement system (Exhibit Appendix: vol. 1, Ex. 62, at 2).

 Massachusetts Public Assistance Control System.

 An S.D.C. officer, see supra.

 This congressional enactment had set deadlines to be met as a precondition for federal funding.

 Mhe investigation found that, while S.D.C. had misrepresented the operational status of its system in Florida, it had not done so maliciously or deliberately, so that it should not be disqualified. (A43-44, paras. 178-179.)

 The Master’s “ultimate findings” appear to be those which he considered to be based upon reasonable inference, rather than upon direct evidence.

 T here is, of course, nothing to prevent the parties from exploring anew any possibility of resolving at this time, by way of settlement, this sixteen year old litigation, rather than pursuing any further litigation.