9 A.3d 508

MEMC ELECTRONIC MATERIALS, INC., et al.

v.

BP SOLAR INTERNATIONAL, INC.

No. 1517, Sept. Term, 2009.

Court of Special Appeals of Maryland.

Dec. 3, 2010.

322

326

Maury S. Epner (Donna E. McBride, Miller, Miller & Canby, Chtd., on the brief) Rockville, MD, for appellant.

Ava E. Lias–Booker (John C. Armstrong, McGuire Woods LLP, on the brief, Baltimore, MD) and Deborah M. Russell (McGuire Woods LLP, on the brief, Richmond, VA), for appellee.

Panel: EYLER, JAMES R., KEHOE, JAMES A. KENNEY, III (Retired, specially assigned), JJ.

EYLER, JAMES R., J.

MEMC Electronic Materials, Inc. and MEMC Pasadena, Inc. (collectively referred to as "MEMC" or "appellant") appeal from a judgment entered by the Circuit Court for Frederick County, after a jury verdict awarding damages for breach of contract to BP Solar International, Inc. ("BP Solar" or "appellee").[1] Prior to 2004, pursuant to a longstanding relationship, appellant supplied appellee with silicon powder for use in manufacturing solar panels at its Frederick, Maryland facility. Seeking to continue that relationship, the parties exchanged e-mails in 2004 concerning a long-term supply contract to run through 2007. After shipping nearly 224 metric tons (MT) of silicon powder in 2005, appellant discontinued its shipments.

Consequently, on April 30, 2007, appellee filed suit charging appellant with breach of contract. Prior to trial, appellee filed four amended complaints.[2] At trial, appellee contended that the e-mail exchanges and the parties' previous course of dealing and performance created a three-year contract, requir-

---

1. Appellee has filed a cross appeal, challenging the court's dismissal of its negligent misrepresentation claim, the court's refusal to admit certain evidence, and the court's admission of certain testimony by appellant's expert witness. Because the cross appeal was conditional, and we affirm the judgment, there is no need to reach the cross appeal issues.

2. The original and amended complaints contained other counts, but they are not relevant to the issues before us.

ing appellant to ship its output of silicon powder to appellee, with a minimum of 150 MT per year. Appellant's primary contention was that there was no meeting of the minds between the parties and, therefore, no contract. After an extensive two-week trial, the jury determined that the parties did form an agreement, and returned a verdict in favor of appellee in the amount of $8,849,447 as partial cover damages for appellant's discontinued performance. Perceiving no reversible error, we shall affirm.

## Factual and Procedural Background

Appellee, a manufacturer of solar energy products, makes photovoltaic panels (also known as solar panels) that are used to convert sunlight into electricity. Appellant is in the business of selling wafers, polysilicon, and other silicon raw feedstock. In 1996, appellee purchased silicon powder from appellant, previously a waste by-product of appellant's polysilicon production process, in order to determine whether the silicon powder, inexpensive at the time, could be used to lower manufacturing costs.

Silicon powder proved useful in reducing costs, and it created a competitive advantage for appellee. Consequently, in 1997, the parties entered into a written, one and a half page sales agreement for the purchase of silicon powder for a two-year period running from April 1, 1997, through March 30, 1999. The agreement required appellant to supply appellee with four MT of silicon powder per month at a price of $3.00 per kilogram. Over the two-year period, appellee sent purchase orders confirming quantity, price, shipping, and other details, and appellant sent the appropriate invoices.

In March 1998, the parties extended this agreement through December 31, 2000. The extension increased the amount of silicon powder to ten MT per month at a price of $3.25 per kilogram, beginning January 1, 1999, and continuing through the end of the contract. Again, confirming purchase orders and subsequent invoices were issued.

Between 2001 and 2004, the parties entered into less formal documented arrangements. These supply agreements were generally consummated through and documented by e-mail exchanges.[3] Each time, after agreement, the parties would follow the usual sequence of purchase orders, invoices, and contractual performance.

Ultimately, anticipating imminent shortages in the market for silicon feedstock supplies, appellee recognized a need to secure long term contracts for the supply of silicon powder. As a result, Pat Barron, appellee's Frederick warehouse manager, was authorized to arrange a long term supply contract with appellant. Herein lies the dispute. It is uncontested that several e-mails were exchanged between August 4, 2004, and November 9, 2004, concerning a long term supply contract between the parties. A printed copy of each e-mail was admitted into evidence. The primary dispute concerns the legal significance of those e-mails.

On August 4, 2004, Mr. Barron e-mailed Sanjeev Lahoti, appellant's product manager, requesting a "quotation (e-mail is fine) for 300 MT of powder per year for calendar years 2005 through 2007. Upon receipt, BP Solar will forward our purchase agreement for these quantities." Mr. Lahoti's September 17 response stated:

> After reviewing our options we want to commit 150MT of powder per year for the next 3 years. The pricing for 2005 would be $3.50/kg. Pricing for 2006 and 2007 would be negotiated in October of the previous year. MEMC would offer to BP any additional quantity available for the following year at th[at] time.

---

3. In August 2000, the parties reached an agreement for the 2001 calendar year via faxes and e-mails. In January 2002, appellee, through its Treasurer, Ron Turcot, sent an e-mail to appellant's product manager, Sanjeev Lahoti, advising its intent to place a purchase order for 144 MT of silicon powder for 2002, and seeking a price of $3.25 per kilogram. Lahoti, on behalf of appellant, agreed to the shipment of 144 MT at $3.25 per kilogram, and requested that appellee send the appropriate purchase order.

**330**

Thereafter, on September 27, 2004, Mr. Barron and Mr. Lahoti discussed, via telephone, the arrangement or contemplated arrangement between the parties. In an e-mail later the same day to Bill Poulin, plant manager at BP Solar's Frederick plant, on which Mr. Lahoti was copied, Mr. Barron described this conversation as follows:

I had a phone conversation with Sanjeev this morning clarifing [sic] the MEMC proposal below. Sanjeev indicates that the 150MT is essentially the *minimum* available for each calendar year 2005–2007. Since this is scrap material for MEMC, their engineering staff has been tasked with improving yield and this is their target based on current levels of production. Sanjeev anticipates the available quantity of powder will be larger (especially in 2005) but did not want to quote a figure higher than their budgeted targets. He has confirmed BP Solar's "right of first refusal" for all quantities of powder they produce. Pricing can be negotiated during MEMC's visit in October.

(Emphasis in original). In his responsive e-mail the following day, Mr. Lahoti stated, "I agree with Pat's comments below. I look forward to meeting you and Pat during our visit."

Two weeks later, on October 13, 2004, Mr. Barron e-mailed Mr. Lahoti asking for confirmation on price. The e-mail stated:

I hope MEMC felt as poitive [sic] about our meeting as we did. As a follow up, you mentioned that you felt you could do better on the pricing of the powder going forward. If you would please send me something in writing, I can begin moving things on this end in terms of a purchase agreement. As stated earlier, BP Solar will commit to taking all quantities available in 2005 and would like to have a right of first refusal in 2006–2007.

On November 9, 2004, Mr. Barron e-mailed Mr. Lahoti concerning purchase orders for the 2005 and 2006 shipments of silicon powder. He stated:

BP Solar has submitted to MEMC our purchase orders # 22692 and # 22693 for silicon powder to cover calendar

years 2005 and 2006. We are not limiting the quantities we would purchase as we will take all the powder that is available under our agreement of right-of-first-refusal (see below). However, I had to put a quantity on the purchase order so I used the same volume that we have been receiving this year. Again, we will take whatever quantities you have available and adjust the PO accordingly.

We would also like to give MEMC a purchase order for our 2007 requirements. Does that work for you?

Following this series of e-mail conversations, appellant shipped nearly 224 MT of silicon powder during 2005. The last shipment occurred on December 30, 2005.

In late February 2006, appellee contacted appellant because it had not received any shipments since December. Upon inquiry, appellee was informed that appellant was experimenting with ways to recycle its silicon powder in its process, and therefore, it had only minimal excess powder. In essence, appellant advised appellee that it should not rely on further shipments. Accordingly, appellee filed suit, seeking damages for breach of a contract allegedly formed through the parties' e-mail exchange.

Prior to trial, appellant moved for summary judgment, arguing that as a matter of law, the parties had never reached the clear meeting of the minds necessary to form a contract. The motion was denied. Appellant argued then and throughout the trial that appellee had changed its position, during the pleading and discovery process, as to the terms of the alleged contract. During the trial, appellant continued its stance that the e-mails did not evidence a meeting of the minds. At the close of appellee's case, and at the close of all evidence, appellant moved for judgment, reasserting its argument that appellee could not make up its own mind regarding the terms of the alleged contract and could not prove a clear meeting of the minds. These motions were also denied.

After a two-week trial, the jury found that the parties entered into a contract by which appellant was obligated to supply appellee with silicon powder for the years 2005–07.

The jury further found that appellant breached this contract. Consequently, it awarded damages in the amount of $8,849,447 as partial cover damages that resulted from appellant's failure to supply appellee with silicon powder in 2007.

Additional facts will be incorporated as necessary to complete our discussion.

## Questions Presented

Appellant presents a number of issues for our review, which we condense and restate as follows: [4]

1) Whether appellant preserved for review its challenge to the sufficiency of the writings under the Statute of Frauds and, if so, whether the printed copies of the e-mails are sufficient to satisfy the Statute.

2) Whether the trial court abused its discretion and whether appellant was prejudiced by court rulings (a) admitting into evidence the prior sworn testimony of Sanjeev Lahoti regarding an alleged corporate practice of appellant of selling polysilicon products to third parties on the spot market, notwithstanding prior contractual obligations; (b) excluding from evidence appellee's original and first, second, and third amended complaints; (c) initially precluding use of

4. Appellant originally presented the questions for our review as follows:
1) Whether the trial court abused its discretion when it enabled BP to conceal from the jury BP's changes of position and inconsistent statements by (a) excluding from evidence inconsistent factual assertions in BP's prior complaints; (b) precluding cross-examination of BP Solar's most important witness concerning inconsistent deposition testimony; and (c) in response to a clarifying question from the jury, instructing the jury inconsistently with BP's oft-repeated claim that it was pursuing an output contract.
2) Whether any writing, sufficient under the Statute of Frauds, supported BP's claim to the third year of its alleged three-year contract.
3) Whether there was sufficient evidence to support the jury's damages award, based on expert opinions concerning "reasonable price" that were speculative, at variance with the Maryland Uniform Commercial Code, and premised on a contract theory that the jury was permitted to disregard.
4) Whether the trial court abused its discretion by allowing introduction of certain evidence as "routine practice" under Maryland Rule 5–406, where the "practice" was not relevant to any issue in the case.

Mr. Barron's original deposition testimony, as distinguished from errata pages, during his cross-examination, but later allowing its use during appellant's case in chief; and (d) responding to a question from the jury during deliberations, which allowed the jury to determine if the parties entered into a general contract, rather than requiring the jury to determine if the parties entered into an *output* contract. 3) Whether the trial court abused its discretion in admitting the expert testimony of Richard Winegarner, and whether such testimony was sufficient to support the jury's damages award.

## Contentions

### 1. *Appellant's Contentions*

With respect to the Statute of Frauds issue, question 1, appellant contends that the Statute of Frauds was not satisfied with respect to the year 2007.[5] To that point, appellant argues that there were no writings sufficient to indicate a contract for sale for 2007 because the parties' exchanges never advanced beyond negotiations. Appellant notes that appellee did not send any purchase orders to appellant for the year 2007 that could serve to satisfy the merchant's exception to the Statute.[6]

With respect to question 2, appellant contends that the trial court erred in a number of rulings. In that respect, appellant argues that (1) the admission of Mr. Lahoti's testimony from another case was unduly prejudicial and lacked probative value as irrelevant "routine practice" evidence; (2) appellee's superseded complaints were admissible as statements of a party opponent; (3) the court's delayed allowance of appellant

---

5. Appellant's arguments are limited to the year 2007, presumably because the jury awarded damages for that year only.

6. In general, Commercial Law Section 2–201(1) of the Maryland Uniform Commercial Code ("MD UCC") requires a writing signed by the party against whom enforcement is sought. Between merchants, the requirement can be satisfied by a writing from the other party to the transaction. *See* Discussion I.B., *infra.*

to play excerpts from Mr. Barron's deposition testimony could not cure the prejudicial effect of the court's initial refusal during live cross-examination; and (4) the trial court improperly responded to a question from the jury during deliberations, which allowed the jury to find a contract different from that alleged in the fourth amended complaint, an output contract, which was defended against at trial.

Finally, with respect to question 3, appellant contends that the court erred with respect to Mr. Winegarner's testimony. Appellant argues that Mr. Winegarner lacked the qualifications, methodology, and factual basis necessary to provide expert testimony. Appellant further argues that Mr. Winegarner's opinions pertaining to the reasonable price of silicon powder did not provide the jury with sufficient evidence to support a damages verdict because his opinions were not tied to "time of delivery." Lastly, appellant argues that Mr. Winegarner's opinions regarding reasonable price were tied to an alleged output contract and, therefore, left the jury without any factual basis for assessing damages for breach of a contract in general.

### 2. *Appellee's Contentions*

Preliminarily, appellee argues that appellant failed to preserve for review its argument concerning the Statute of Frauds and the merchants' exception because it neglected to argue this point in its motions for judgment at the close of appellee's case and at the close of all the evidence. In the event the issue is preserved, appellee argues that, collectively, the printed e-mails satisfied the Statute and/or the merchants' exception, and that the parties' demonstrated intent to negotiate prices for subsequent years did not render the contract unenforceable.

With respect to the court's rulings challenged in question 2, appellee argues that the court did not abuse its discretion. Appellee further argues that, even if the court erred in any of these respects, such errors were not sufficiently prejudicial as to constitute reversible error.

Finally, with respect to Mr. Winegarner's expert testimony, appellee argues that appellant failed to preserve this issue for appeal. Nevertheless, assuming the issue is preserved, appellee contends that Mr. Winegarner is an undisputed expert in polysilicon, that his opinions were indeed grounded on an adequate factual basis, and that his opinions provided sufficient factual basis to enable the jury to determine the reasonable price for silicon under a three-year agreement.

### Discussion

#### 1. Challenge to Sufficiency of Writings Under the Statute of Frauds

#### A. Preservation of Issue for Appeal

In seeking reversal of the trial court's judgment, appellant argues that the parties attempted to negotiate an agreement for 2007 but never reached agreement. Consequently, there was not and could not be a confirmatory writing that would satisfy the merchants' exception because there was no agreement to confirm. Appellant notes that appellee never sent a purchase order for silicon powder for 2007, as it did for the years 2005 and 2006. Preliminarily, appellee responds by arguing that appellant failed to preserve this challenge for review by neglecting to argue this specific point in its two motions for judgment.

Appellant presents its arguments in the abstract and does not tie them to a particular ruling by the court. We assume, as does appellee, that the alleged basis for error is the denial of appellant's motions for judgment, pursuant to Maryland Rule 2–519, on the ground that the Statute was not satisfied. A motion for judgment must "state with particularity all reasons why the motion should be granted." Maryland Rule 2–519(a). In that respect, it is well-settled that "[f]ailure to state a reason [why the motion for judgment should be granted] serves to withdraw the issue from appellate review." *Kent Vill. Assocs. Joint Venture v. Smith,* 104 Md.App. 507, 517, 657 A.2d 330 (1995); *see also Laubach v. Franklin Square Hosp.,* 79 Md.App. 203, 208, 556 A.2d 682 (1989) ("[I]n

order to preserve an issue for appellate review, the moving party must have, in to [*sic*] making the motion either at the close of the plaintiff's case or after all the evidence, stated with particularity all reasons why the motion should be granted.") (Internal quotations omitted).

With respect to the breach of contract count, appellant argued in support of its first motion that (1) there was no definitive offer and acceptance because Mr. Lahoti's e-mail dated September 28, 2004 merely served to confirm Mr. Barron's understanding of the negotiations, and (2) appellee's breach of contract claim was barred by a one-year statute of limitations provision included in the parties' 1997 supply agreement. In support of its renewed motion at the close of all the evidence, appellant incorporated its earlier arguments and, in addition, argued that because the alleged contract did not include a price, a damage award could only be supported by testimony regarding a reasonable price at the time of delivery pursuant to § 2–305 of the Maryland Uniform Commercial Code ("MD UCC"). Thus, according to appellant, the absence of such testimony required the jury to speculate on the issue and, therefore, warranted judgment in its favor regarding appellee's claim for cover damages.

On the record before us, it is apparent that none of these arguments pertain to appellant's current contention on appeal that no writing by appellee was sufficient to satisfy the merchants' exception to the Statute of Frauds. Consequently, this issue is not properly preserved for appellate review.

### B. The Writings Satisfy the Statute of Frauds and Its Merchants' Exception

Assuming appellant's argument is preserved, we conclude it is without merit. Commercial Law Section 2–201(1) of the MD UCC provides:

[A] contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his

authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

Maryland Code (2002 Repl.Vol.), § 2–201(1) of the Commercial Law Article ("CL"). Thus, the Statute effectively requires a writing that (1) is sufficient to indicate a contract for sale of goods of $500 or more between the parties; (2) is signed by the party against whom enforcement is sought; and (3) contains a quantity term.[7] The rule also provides an exception for merchants, which states that a writing in confirmation of the contract and sufficient against the sender that is received by a party who has reason to know of its contents satisfies the requirements of subsection (1) against the receiving party unless written notice of objection is given within ten days of receipt. CL § 2–201(2). We conclude that the e-mail exchange between the parties satisfies both the requirements of the Statute and the merchants' exception.

As noted above, appellant argues that there was no writing that satisfied the Statute of Frauds pertaining to the 2007 calendar year. To this point, appellant argues that it "never signed any writing sufficient to indicate that a contract for sale of silicon powder for three years was ever made between itself and [appellee]." Moreover, appellant points to the fact that appellee sent purchase orders in 2005 and 2006 that satisfied the merchants' exception for those years, but failed to send a purchase order for 2007. With respect to the November 9, 2004 e-mail from Mr. Barron to Mr. Lahoti, appellant argues that this writing is merely representative of ongoing negotiations and does not "indicate that a contract for sale has been made for 2007, nor is it [confirmative] of a contract for 2007."

---

**7.** The Official Comments to the MD UCC provide that "[t]he only term which must appear is the quantity term which need not be accurately stated but recovery is limited to the amount stated. The price, time and place of payment or delivery, the general quality of the goods, or any particular warranties may all be omitted." CL § 2–201, *cmt.* 1.

Here, however, the question regarding whether there was a contract and, if so, its terms, was left to the jury. Appellant does not challenge the court's determination that whether a contract existed was a jury question; its challenge is limited to the requirements of the Statute of Frauds. With respect to quantity, there was evidence that the parties agreed to a specific quantity or a minimum quantity with a right of first refusal of output or an agreement to buy output. The jury was instructed as to the relevant contract principles, including considerations relevant to an output contract.

After reviewing all of the documents and testimonial evidence, the jury determined that the parties entered into a three-year contract that covered the 2007 calendar year. The relevant question on the verdict sheet, which the jury answered in the affirmative, was: "Do you find that the parties entered into a contract by which MEMC was obligated to supply BP Solar with silicon powder for calendar years 2005, 2006, and 2007?" Thus, we do not know the terms of the contract as found by the jury, except to the extent we can infer them from the damages awarded.

Appellee's position during trial was that it had the right to appellant's output with a minimum quantity. It claimed damages for the years 2004–2007, consisting of cover damages under CL § 2–712, non-delivery damages under CL § 2–713, and consequential and incidental damages under CL § 2–715. The verdict sheet reveals that the damages awarded were only for "partial cover damages." The jury awarded "0" damages for "non-delivery damages," "consequential damages," and "incidental damages." Christopher Rosenthal and Mr. Winegarner, appellee's expert witnesses, opined, *inter alia,* as to the amount of cover damages for the year 2007, calculated at a contract price of $8.00 per kilogram, assuming a contract existed between the parties herein. The witnesses applied that price to the amount of silicon purchased from other suppliers by appellee in that year, and compared it to the actual price paid by appellee in that year. Because the amount awarded by the jury as cover damages matched the amount of cover damages claimed for the year 2007, as

testified to by appellee's experts, appellant infers that the jury found that appellant was obligated to make its output available to appellee at a contract price of $8.00 per kilogram, and it awarded the entire amount claimed.

On appeal, appellant does not raise any issue regarding the initial jury instructions or the verdict sheet. As a result, appellant's argument that the Statute of Frauds was unsatisfied because there was no contract that could be confirmed in writing must necessarily fail. The jury determined there was a contract. Thus, what we must determine is whether there was a legally sufficient confirmatory writing.

While underlying facts may be disputed in a given case, when resolved, the ultimate decision as to whether a writing satisfies the Statute's requirements is a question of law. *Salisbury Bldg. Supply Co. v. Krause Marine Towing Corp.,* 162 Md.App. 154, 161, 873 A.2d 452 (2005). We review decisions involving application of Maryland statutory law for legal correctness under a *de novo* standard of review. *Schisler v. State,* 394 Md. 519, 535, 907 A.2d 175 (2006) (discussing *de novo* review of issues involving interpretation and application of Maryland constitutional, statutory, or case law).

Here, the printed e-mails constitute a sufficient writing under the Statute. Maryland law recognizes that a series of communications can satisfy the Statute's requirements. *See Tatum v. Richter,* 280 Md. 332, 335–36, 373 A.2d 923 (1977) (holding that a purchase order and bill of sale established the existence of an oral contract and satisfied the Statute). In addition, e-mail communications can amount to a sufficient writing under the Statute. *See* CL § 1–201(46) (noting that " 'writing' includes printing, typewriting, or any other intentional reduction to tangible forms"). In that regard, if so intended, a typed name is a sufficient signature as an agent of the party against whom enforcement is sought. *See id.* § 1–201, *cmt.* 39 ("No catalog of possible authentications can be complete and the court must use common sense and commercial experience in passing upon these matters. The question

always is whether the symbol was executed or adopted by the party with present intention to authenticate the writing.").

Furthermore, the purpose of the Statute is to avoid fraud—not to prevent enforcement of legitimate transactions. Consequently, in regard to that purpose, we have stated that the Statute is intended to prevent

> successful fraud [through] inducing the enforcement of contracts that were never in fact made. It is not to prevent the performance or enforcement of oral contracts that have in fact been made; it is not to create a loophole of escape for dishonest repudiators. Therefore, we should always be satisfied with "some note or memorandum" that is adequate, when considered with the admitted facts, the surrounding circumstances, and all explanatory and corroborative and rebutting evidence, to convince the court that there is no serious possibility of consummating a fraud by enforcement.

*Collins v. Morris,* 122 Md.App. 764, 773–74, 716 A.2d 384 (1998). This purpose has guided our examination of the sufficiency of particular writings under the Statute:

> The Statute of Frauds was not enacted to afford persons a means of evading just obligations; . . . nor was it adopted to enable defendants to interpose the Statute as a bar to a contract fairly, and admittedly, made. . . . Therefore, if after a consideration of the surrounding circumstances, the pertinent facts and all the evidence in a particular case, the court concludes that enforcement of the agreement will not subject the defendant to fraudulent claims, the purpose of the Statute will best be served by holding the note or memorandum sufficient even though it is ambiguous or incomplete.

*Salisbury Bldg. Supply Co.,* 162 Md.App. at 162, 873 A.2d 452 (quoting Williston on Contracts, § 29:4 at 437–38 (4th ed.1999)). Thus, even an incomplete writing can be sufficient so long as the court is satisfied that enforcement of the agreement will not advance a fraudulent claim.

With these principles in mind, we turn to the last requirement, that the writing contain a quantity term, which was the subject of much dispute at the trial court level. Though the

verdict sheet does not reveal the precise terms of the contract that the jury found, it is evident that the e-mails support a finding of a specific minimum quantity (150 MT) with a right of first refusal of output or an agreement to buy output. In either event, appellant was obligated to make its output available to appellee. As discussed, the writing requirement in the Statute of Frauds is designed to prevent fraud, not prevent enforcement of legitimate transactions. With respect to the quantity term, because of the factual uncertainty as to the terms of any contract, the jury had to resolve that issue. Once resolved, we look to the writing to see if it contains a quantity term because the contract cannot be enforced beyond the quantity stated.

Here, Mr. Lahoti's September 17, 2004 e-mail committed appellant to 150 MT per year for three years. Thereafter, Mr. Baron's September 27 e-mail clarifying the proposal as to quantity stated that 150 MT was the minimum amount of silicon powder available for 2005–07, and that appellee held a right of first refusal for all excess quantities produced. Mr. Lahoti's responsive e-mail of September 28 served as confirmation of the terms by stating "I agree with Pat's comment's below." Thus, taken together, these e-mails represent the parties' reciprocal agreement that appellant would make its output available to appellee and would supply a minimum amount. Therefore, the September 28 e-mail served as a writing sufficient to satisfy the quantity term of the contract.

Finally, we note that the e-mail dated September 27 from Mr. Barron to Mr. Lahoti and Mr. Poulin satisfies the merchants' exception. That e-mail, especially in light of Mr. Lahoti's September 28 reply, serves as the required confirmatory e-mail under the exception. Thereafter, neither Mr. Lahoti nor any agent of appellant sent written notice of objection within ten days as required by the Statute. Consequently, the September 27 e-mail satisfies the merchants' exception to the Statute.

As a result, we reject appellant's argument that the Statute of Frauds bars appellee's claim as to the year 2007.

## 2. *Rulings of the Court*

First, appellant contends that the court improperly admitted deposition testimony of Mr. Lahoti from a prior action involving another of appellant's customers. Next, appellant challenges the court's refusal to admit into evidence appellee's amended complaints. Additionally, appellant argues that, during its cross-examination of Mr. Barron, the trial court improperly precluded the use for impeachment purposes of the witness's original deposition testimony. Lastly, in addition to appellant's evidentiary challenges, appellant argues that the trial court's response to a jury note received during deliberations constituted an abuse of discretion.

We have noted that "[t]he admission or exclusion of evidence is left to the sound discretion of the trial court." *Lomax v. Comptroller of Treasury,* 88 Md.App. 50, 54, 591 A.2d 1311 (1991). We review rulings pertaining to the admissibility of evidence for an abuse of discretion, *Brown v. Daniel Realty Co.,* 409 Md. 565, 583, 976 A.2d 300 (2009), which occurs where "no reasonable person would share the view taken by the trial judge." *Id.* at 601, 976 A.2d 300. Maryland Rule 5–103(a) states that "[e]rror may not be predicated upon a ruling that admits or excludes evidence unless the party is prejudiced by the ruling." "It is not the possibility, but the probability, of prejudice which is the object of the appellate inquiry." *Crane v. Dunn,* 382 Md. 83, 91, 854 A.2d 1180 (2004) (internal quotations omitted). Further, "[we] will only reverse upon finding that the trial judge's determination was both manifestly wrong and substantially injurious." *Lomax,* 88 Md.App. at 54, 591 A.2d 1311 (internal citation omitted). "The party maintaining that error occurred has the burden of showing that the error complained of likely affected the verdict below." *Brown,* 409 Md. at 584, 976 A.2d 300. These considerations will guide our analysis of the complained of evidentiary rulings.

### A. *Admission of Mr. Lahoti's Prior Testimony*

Appellee sought to introduce evidence under Rule 5–406 to establish that appellant had a "corporate practice of

shipping polysilicon to the highest bidder on the spot market due to revenue pressures notwithstanding and in violation of its contractual commitments to long standing customers, like [appellee]."[8] The court did not permit appellee to introduce all of the evidence that it proffered. The court did permit appellee to introduce the following testimony by Mr. Lahoti, in a deposition taken in litigation involving ASi Industries GmbH ("ASi"), another of appellant's customers.[9] During that deposition, Mr. Lahoti testified:

> Q: So the corporate policy at MEMC was that if someone was willing to pay more, you would sell to that customer, notwithstanding the fact that you might have a contractual commitment to another customer having a lower price?
>
> \* \* \*
>
> A: ... [I]t wasn't a written policy, no.
>
> Q: But that was a policy?
>
> A: We did that, yes.
>
> Q: And that policy came from where?
>
> A: It came from my, my supervisor....

Appellant objected, explaining that this testimony was irrelevant, as it concerned an allocation provision of an acknowledged contract with ASi that appellant argued allowed it to sell high to one customer rather than low to another. Thus, according to appellant, it had no bearing on whether the parties in the case at bar had ever formed a contract.

---

**8.** Rule 5–406 provides that "[e]vidence of the habit of a person or of the routine practice of an organization is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice."

**9.** Appellant also alleges that the trial court abused its discretion in permitting appellee to play an excerpt from the deposition of Nabeel Gareeb, appellant's then-CEO, wherein Mr. Gareeb commented on the Lahoti excerpt. Appellant primarily focuses on the Lahoti excerpt, however, in making its argument.

In allowing the excerpt, the court made specific findings of relevance, and stated that the excerpt was "relevant as to how each party saw [the alleged contract].... I think that the way [appellant] operated is relevant to its view of whether there was a contract or not."

On appeal, appellant reasserts its argument that this testimony was irrelevant as it served no purpose in evaluating whether the parties ever formed a contract. Additionally, appellant argues that even if this evidence had slight probative value, the risk of unfair prejudice and confusion vastly outweighed that value, thereby rendering the evidence inadmissible under Maryland Rule 5–403.[10]

As stated, the question of relevance is quintessentially within the trial court's discretion. *See, e.g., Fenner v. State,* 381 Md. 1, 25, 846 A.2d 1020 (2004) ("It is well established in Maryland that the admission of relevant evidence, ... is committed to the considerable and sound discretion of the trial court and will not be disturbed on appeal absent a clear abuse of discretion."); *Merzbacher v. State,* 346 Md. 391, 404–05, 697 A.2d 432 (1997) (stating that "[o]nce a finding of relevancy has been made, we are generally loath to reverse a trial court unless the evidence is plainly inadmissible under a specific rule or principle of law or there is a clear showing of an abuse of discretion").

Here, while refusing to admit several other excerpts of prior testimony whereby appellant's officials described the alleged corporate practice to which Mr. Lahoti testified, the court distinguished this particular excerpt by explaining that "Mr. Lahoti was directly [and intimately] involved with this contract." Therefore, according to the court, the Lahoti excerpt had special relevance to the issue of whether the parties

---

10. Rule 5–403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Notably, appellant does not argue that this evidence was improper routine practice evidence within the meaning of Rule 5–406, and we need not address that issue.

reached an agreement because it could be found to provide insight as to appellant's view of its relationship with appellee: that notwithstanding its prior contractual commitment, appellant could sell to a customer willing to pay a higher price. We see no clear abuse of discretion that would warrant reversal.

 With respect to Rule 5–403, appellant makes only one argument. Appellant argues that admitting this excerpt was prejudicial because the court would not allow appellant to explain the context of Mr. Lahoti's testimony without opening the door to appellee's introduction of additional corporate practice evidence.

In essence, appellant sought from the court permission to call a witness to explain the context of Mr. Lahoti's testimony, without allowing complete cross-examination of that witness. Though this may have created for appellant an undesirable dilemma, it is not the type of ruling that can be considered "manifestly wrong and substantially injurious." *Lomax,* 88 Md.App. at 54, 591 A.2d 1311. Consequently, we perceive no abuse of discretion.

### B. Exclusion of Superseded Complaints

 Appellant next challenges the court's exclusion of appellee's complaints filed prior to its fourth amended complaint. On April 30, 2007, appellee filed its original complaint, which stated that "the parties reached an agreement regarding the sale of silicon powder by [appellant] to [appellee] for the calendar years 2005 and 2006;" that "[t]he parties agreed upon minimum quantities that [appellant] would sell and ship to [appellee];" and that "[i]f any additional quantities were generated, the parties agreed that [appellee] had a right of first refusal for the additional quantities of silicon powder" that were produced. Relying on these factual assertions, appellee claimed, *inter alia,* that appellant breached a two-year supply contract, pursuant to which appellee held a right of first refusal for excess quantities produced, for the calendar years of 2005 and 2006.

Thereafter, on October 5, 2007, appellee filed its first of a series of amended complaints, asserting, *inter alia*, that the alleged contract actually covered the *three* calendar years from 2005–2007. (Emphasis added). This complaint continued to assert appellee's right of first refusal for additional quantities of silicon powder that appellant produced. On January 11, 2008, appellee filed its second amended complaint, which encompassed an additional factual assertion that "[t]he terms of the agreement were set forth in a series of writings that included email exchanges between the parties and purchase orders...." Ultimately, on May 26, 2009, appellee filed a fourth amended complaint,[11] wherein appellee alleged that appellant "refus[ed] to comply with its agreement to give [appellee] the right to purchase all additional quantities of silicon powder that [were] produced in each of those years." The complaints were signed by counsel but not by a corporate representative of appellant.

At trial, appellant argued that appellee changed its initial allegation that the parties entered into a two-year supply agreement with a right of first refusal of output to allege that, in fact, the parties entered into a three-year output contract in which appellee was obligated to buy output. In so doing, appellant attempted to introduce the superseded complaints into evidence, arguing that the inconsistencies in the complaints substantiated its position that there was never "any clear meeting of the minds with respect to the formation of the alleged contract," because appellee "had never been able to state, authoritatively and consistently, what it believed to be the terms of its alleged contract with [appellant]." Thus, because appellee "could not even make up its *own* mind as to the terms of its alleged contract, then it could not possibly have ever reached a *meeting* of the minds as to any terms of any such contract with [appellant]." (Emphasis in original). Nevertheless, the trial court rejected these arguments and refused to admit the superseded complaints into evidence.

---

11. A third amended complaint was filed on November 20, 2008, which primarily served to amend a separate count for promissory estoppel.

On appeal, appellant renews these arguments in contending that exclusion of the amended complaints, in light of the alleged inconsistent allegations contained therein, amounts to reversible error. Appellant believes they should have been admitted as statements of a party opponent pursuant to Maryland Rule 5–803(a), and relies on language from *Crane*, 382 Md. at 96, 854 A.2d 1180, where the Court of Appeals stated that "[a] party may offer into evidence against his opponent anything said by him as long as it illustrates some inconsistency with the facts now asserted by the opponent in pleadings or in testimony." According to appellant, the court's exclusionary ruling was prejudicial because it enabled appellee to hide its "change in stories," rather than have to explain the alleged inconsistencies. To that point, appellant argues that the exclusion of these complaints prevented the jury from assessing the credibility of appellee's witnesses.[12]

Appellee responds by arguing that the factual allegations in the amended complaints regarding the circumstances surrounding the formation of the alleged contract did not change. Instead, according to appellee, the changes only represented changes in the legal conclusions deduced from those underlying facts, and therefore, the complaints were properly excluded.

As discussed, the trial court enjoys wide discretion in admitting or excluding evidence. We reject appellant's arguments for several reasons. First, *Crane* is not controlling as a careful reading of the complaints in this case indicates that the underlying facts do not vary substantially among the amended complaints. Although subsequent complaints incorporate the 2007 calendar year, the central facts alleged in the original complaint surrounding the formation of the alleged contract continue to form the basis for the breach of contract claim in

---

**12.** Appellant's rationale is that these witnesses testified at trial that they always thought the parties had reached a three-year output contract, even though contemporaneous correspondence allegedly showed otherwise. Therefore, the exclusion of the earlier complaints hindered appellant from further discrediting the witnesses before the jury.

the amended complaints. It is the characterization of those underlying facts that varies within the amended complaints— that the e-mails created a three-year contract, rather than a two-year contract, and that they created an output contract, as distinguished from a right of first refusal.

For pleading purposes, an amended complaint that does not incorporate or otherwise reference a prior complaint supersedes prior complaints and becomes the operative complaint. *Shapiro v. Sherwood,* 254 Md. 235, 239, 254 A.2d 357 (1969). This does not necessarily mean, however, that the contents of a superseded pleading may not be admissible in evidence as an admission or for purposes of impeachment.

We are unaware of any reported Maryland appellate court opinions on point. A number of cases from other states support the proposition that legal conclusions, including interpretations of contracts, or characterizations pertaining to certain facts are not admissible as evidence. *See, e.g., Conley v. Life Care Ctrs. of Am., Inc.,* 236 S.W.3d 713, 743 (Tenn.Ct. App.2007) (excluding superseded pleadings because they "did not constitute factual statements or admissions of fact"); *Amador v. Lea's Auto Sales & Leasing, Inc.,* 916 S.W.2d 845, 850 (Mo.Ct.App.1996) (stating that "[c]ase law is clear that there is a difference between statements of fact and legal conclusions"). *See also Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1355 (Fed.Cir.2004) (denying the use of prior pleading as a factual admission, stating that "the Government has not made a factual admission; rather, it has taken a litigation stance on an issue of law" and that "the Government's position is merely a legal theory developed during litigation"). As a general proposition, we agree with those cases. As is true with all questions of admissibility, however, the admissibility of complaints has to be determined on a case by case basis, after due consideration of relevance, potential prejudice, and any rule of exclusion that might be applicable to specific content. Admissibility may also be

affected if the complaint was signed, verified, or even reviewed by a party or testifying witness.

To the extent any changes in allegations were arguably factual in nature, we conclude that they were not the type of first level fact that compelled admission into evidence. Thus, the ruling was within the trial court's discretion.

Second, the record is devoid of any effort or proffer by appellant to redact all but what was arguably factual in nature. It is clear that most of the content of the complaints, relating to breach of contract, was not factual but contained legal characterizations and conclusions, the exclusion of which was well within the court's discretion. Moreover, the complaints contained counts in addition to breach of contract which were totally irrelevant for the purpose for which they were being offered. Appellant argued for admission of the complaints on an all-or-nothing basis. Under those circumstances, it was not an abuse of discretion for the trial court to exclude the complaints in an effort to ensure that the change in legal conclusions contained therein did not improperly influence the jury.

Finally, appellant has failed to demonstrate prejudicial error. Throughout the trial, appellant was permitted to and consistently did stress the perceived inconsistencies of appellee's position from opening statement, through witness examinations, to closing argument. The jury was familiar with appellant's position that appellee's inconsistent interpretations of the alleged contract suggested that no meeting of the minds had ever occurred. The jury was also aware that appellee filed an original and four amended complaints. Appellant brought out the existence of the amended complaints through the testimony of Mr. Rosenthal and referred to them in its closing argument. In addition, the court instructed the jury, presumably at the request of a party, that appellee had filed four amended complaints and that it had a right to do that. The introduction of the complaints would have added little, particularly in light of the fact that there was no evidence that any of the witnesses who testified actually reviewed the com-

plaints.[13] Consequently, we do not perceive from this record that admission of the complaints would have affected the verdict such that their exclusion constitutes reversible error.

### C. Preclusion of Mr. Barron's Original Deposition Testimony During Cross-examination

 Mr. Barron was deposed on April 2, 2009. During the deposition, Mr. Barron discussed his understanding of the terms of the alleged contract. Six weeks after his deposition, Mr. Barron submitted an errata sheet pursuant to Maryland Rule 2–415(d), which purported to supplement and explain certain statements made during his deposition.

At trial, Mr. Barron testified, *inter alia,* concerning his belief regarding the terms of the alleged agreement. Appellant sought to impeach Mr. Barron's testimony with statements made during his deposition that were later "changed" by his errata sheet, which it believed were "fatally inconsistent" with his trial testimony. Appellee objected, arguing that the excerpt on which appellant relied was changed by the errata sheet and therefore was no longer part of the transcript. In response, appellant argued that when a deponent submits an errata sheet correcting statements made during the deposition, counsel is "entitled to inquire as to the inconsistency in the two statements."

Initially, the trial court sustained the objection, and appellant was not permitted to conduct live cross-examination of Mr. Barron concerning that portion of the original transcript which was the subject of the errata sheet. One week later,

---

**13.** In that regard, Mr. Barron was the only witness who had knowledge of the basic underlying facts, but there is no evidence that he was involved in the drafting of the complaints.

There was, however, a bench conference during appellant's cross-examination of BP Solar CEO Lee Edwards, during which the trial court denied appellant's attempt to introduce a portion of Mr. Edwards's deposition during which he allegedly testified that he was involved in the decision-making process that led to the filing of the original complaint. Thus, ultimately, there was no evidence before the jury that any of the testifying witnesses reviewed the complaints.

however, following appellant's request to present Mr. Barron's deposition testimony during its case in chief, the court allowed appellant to play the original deposition testimony, so long as it also contemporaneously presented relevant portions of Mr. Barron's errata sheet. Under these circumstances, although excerpts of Mr. Barron's original deposition testimony were ultimately admitted, he was never subject to live cross-examination concerning the alleged inconsistencies between that testimony and the errata sheet.

▮ Appellant now argues that, notwithstanding the court's attempt to correct its error, appellant was prejudiced by the court's initial ruling excluding the use of a portion of Mr. Barron's deposition testimony during live cross-examination. According to appellant, because "the only evidence of [appellee]'s output contract claim was the tenuous word of a few employees," Mr. Barron should have been required to explain the inconsistencies in his testimony.

In our view, appellant has failed to demonstrate that it suffered the level of prejudice that would warrant reversal. Without minimizing the acknowledged importance of live cross-examination, we note that appellant utilized Mr. Barron's errata sheet during cross-examination; extensively questioned Mr. Barron at trial regarding many of the issues covered in the deposition and the errata sheet; and was ultimately able to play the video excerpts for the jury during its case in chief and closing argument. In closing argument, appellant focused on what it perceived as four different versions of Mr. Barron's testimony—his e-mail, his original deposition testimony, the errata sheet, and his testimony at trial. Through cross-examination of fact and expert witnesses, appellant repeatedly presented to the jury its position that appellee's version of the contract was a moving target. Acknowledging that cross-examination is a crucial component of our system of justice, the court's ruling enabled appellant to argue the existence of an inconsistency that the witness could not purport to explain because the asserted inconsistency was introduced during appellant's case in chief.

Based on our review of the record, while the court should have permitted appellant to cross-examine Mr. Baron about the contents of his original deposition and errata sheet, we are satisfied that the court's actions were not so prejudicial as to warrant reversal.

### D. Court's Response to Jury's Note

As discussed above, the main issue at trial was whether a contract existed and, if so, its terms. There was conflicting evidence regarding the length of the contract and whether it was for a specific quantity or for output. These differences existed in the context of whether there was a meeting of the minds sufficient to create a contract, and if so, whether the writing requirement of the Statute of Frauds was satisfied. As a result, the trial court instructed the jury as to general contract law and as to the requirements of the Statute, including its requirement that a contract is not enforceable beyond the quantity of goods shown in the writing.[14]

During deliberations, the jury sent a note to the court. In that note, the jury requested clarification regarding whether it was "deciding exclusively if [the alleged contract was] an output contract or a contract in general." The trial court advised the jury that "[my] instruction on an output contract is to assist you in determining whether there is a contract between the parties and to interpret its terms if you find that there is a contract." Thus, the court effectively declined to require the jury to find one of two extremes: an output contract or no contract at all. Following the court's response, the jury returned a verdict indicating that it found that appellant breached a supply contract that spanned the 2005–07 calendar years and assessed damages as described above.

---

**14.** As part of its instructions on contract law, the court instructed: "Now you may find that [appellee] and [appellant] entered into a contract that measures the quantity by the output of the seller and requires a purchaser, uh, to purchase all of that, uh, output. A contract for output of the seller does not fail for indefiniteness." This instruction allowed the jury to find that the parties reached an output contract, but did not compel the jury to so find.

Appellant challenges the court's response to the jury note. Appellant argues that appellee had bound itself to an output contract, and the jury should have been required to find an output contract or none at all.

Appellant raises no issue with respect to either the jury instructions or the verdict sheet. Yet, the court's response to the jury note was consistent with both the instructions, which did not bind the jury to one of two extremes, as well as the verdict sheet, which merely asked the jury if there was a contract and, if so, whether it was breached. The court's general response to the jury's question did not in any way change the import of its earlier instructions or that of the question on the verdict sheet. Therefore, the court did not abuse its discretion in responding to the jury note, and appellant's contention has no merit.

### 3. *Mr. Winegarner's Testimony*

In light of the fact that the contract, as alleged by appellee, contained a term that pricing would be negotiated in October of the year preceding the shipment year, appellee called Richard Winegarner, its first expert witness, to testify concerning the "reasonable price" for silicon powder as of October 2005 and October 2006 for the following year's deliveries of powder.[15] Mr. Winegarner, a market researcher in the polysilicon industry for the past twenty-five years, testified that a reasonable price in October 2005 for the sale of powder in 2006 was between $4.50 and $5.50 per kilogram, and that a reasonable price in October 2006 for sale of powder in 2007 was between $7.00 and $8.00 per kilogram.[16] These figures

---

**15.** According to § 2–305 of the MD UCC, a "reasonable price" will be used where the contract leaves open the price term. As will be discussed, the parties dispute the time for which the reasonable price is to be determined.

**16.** Mr. Winegarner opined that these numbers represented reasonable long term contract prices, despite the fact that they were significantly less than the average prices on the spot market, which ranged from $40.00 to $77.92 per kilogram, between late 2005 and late 2006, when the prices would have been determined for 2006 and 2007.

were in part premised upon his understanding that appellant was the only producer of silicon powder, and was promising appellee 100% of its output. Thus, according to Mr. Winegarner, there would be no powder available on the spot market had appellant supplied appellee as allegedly agreed, and reliance on a spot market price would therefore be inappropriate.

Additionally, Christopher Rosenthal, appellee's second expert witness, testified concerning appellee's cover damages. Relying on Mr. Winegarner's "reasonable price" determination, Mr. Rosenthal estimated appellee's cover damages pertaining to the silicon powder not supplied in 2007. Ultimately, the jury's damages award was consistent with Mr. Rosenthal's testimony regarding cover damages for 2007.

On appeal, appellant challenges both the admissibility and sufficiency of Mr. Winegarner's testimony in an attempt to invalidate the jury's damage award. First, appellant argues that Mr. Winegarner was not competent to offer an opinion regarding the "reasonable price" for silicon powder in 2006 and 2007. Next, appellant argues that his "reasonable price" opinions were not tied to the "time for delivery" and, therefore, ran afoul of the MD UCC. Lastly, appellant contends that Mr. Winegarner's opinions were premised upon appellee's claim that the parties entered into an output contract. Consequently, according to appellant, because the jury was free to find a contract in general, any damage award for other than an output contract would have been based on speculation because Mr. Winegarner's opinions were exclusively premised upon the economic effects of the alleged output contract. We reject each argument in turn.

### A. Mr. Winegarner's Competency to Offer Expert Testimony

■ Appellant offers three reasons why Mr. Winegarner was not competent to offer expert testimony concerning the "reasonable price" for 2006 and 2007. First, appellant argues that Mr. Winegarner lacked the requisite expertise to render an opinion concerning the reasonable price of silicon powder. To that end, appellant states that Mr. Winegarner had never

before been accepted as an expert witness; had never been involved in commercial sales; had never negotiated a price in any contract; and had never bought or sold polysilicon. Second, appellant argues that Mr. Winegarner's opinions, which were based in part on interviews with sources within the polysilicon industry, lacked the requisite factual basis to qualify as expert testimony. Lastly, appellant argues that Mr. Winegarner's opinions were "untethered to any reliable principles or methods," because "he had not applied any mathematical formula or other regularly accepted methodology." Therefore, according to appellant, the court erred in permitting this testimony.

Trial courts have wide discretion in evaluating expert testimony. The Court of Appeals has "often stated that the admissibility of expert testimony is a matter largely within the discretion of the trial court, and its action in admitting or excluding such testimony will seldom constitute a ground for reversal." *Bryant v. State*, 393 Md. 196, 203, 900 A.2d 227 (2006) (internal quotations omitted). The Court has further stated:

> Rule 5–702 vests trial judges with wide latitude in deciding whether to qualify a witness as an expert and does not limit the discretion of the trial court. The trial court is free to consider any aspect of a witness's background in determining whether the witness is sufficiently familiar with the subject to render an expert opinion, including the witness's formal education, professional training, personal observations, and actual experience. Absent a statute to the contrary, even the lack of particular formal credentials does not disqualify an expert witness, so long as the witness is sufficiently qualified such that the witness's testimony would be helpful to the fact finder.

*In re Adoption/Guardianship No. CCJ14746*, 360 Md. 634, 647, 759 A.2d 755 (2000) (citations omitted). Nevertheless, "[d]espite its broad discretion, a trial court's decision to admit or reject expert testimony is reviewable on appeal and may be reversed if it is founded on an error of law or if the trial court

clearly abused its discretion." *White v. State,* 142 Md.App. 535, 544, 790 A.2d 754 (2002) (internal quotations omitted); *see also Samsun Corp. v. Bennett,* 154 Md.App. 59, 67, 838 A.2d 381 (2003) (same).

In this case, appellant has failed to meet its burden. First, regarding Mr. Winegarner's expertise relating to the price of silicon powder, he is not disqualified from testifying as an expert, even for the first time, simply because he has never before negotiated a price or sold polysilicon. To the contrary, the Court of Appeals has distinctly rejected such a principle. In *Rotwein v. Bogart,* 227 Md. 434, 437, 177 A.2d 258 (1962), the Court of Appeals stated:

> We do not agree entirely with the court's first reason, that the witness could not qualify as an expert in the flooring trade as he had never previously laid a floor. A witness may qualify if he possesses special and sufficient knowledge regardless of whether such knowledge was obtained from study, observation or experience. A law professor may be an expert on trial procedure even though he has never tried a case. There are many expert astronauts who have yet to make a space flight.

*Id.*; *see also Radman v. Harold,* 279 Md. 167, 171, 367 A.2d 472 (1977) ("[W]e perceive no reason why a person who has acquired sufficient knowledge in an area should be disqualified as a medical expert *merely* because he is not a specialist or *merely* because he has never personally performed a particular procedure.") (emphasis in original); *Air Lift, Ltd. v. Bd. of Co. Comm'rs,* 262 Md. 368, 402, 278 A.2d 244 (1971) (holding that "an experienced law enforcement officer who had never been personally involved in policing a rock festival or concert could nonetheless qualify as an expert witness and testify with respect to the security problems associated with such events").

Here, the court accepted, *inter alia,* Mr. Winegarner's twenty-five years of experience tracking the polysilicon market in allowing him to offer expert testimony regarding the price of silicon powder. Though Mr. Winegarner had not directly engaged in the purchase or sale of silicon powder, he

had tracked and analyzed this information for a number of years. In fact, even while objecting to Mr. Winegarner's ability to offer testimony concerning pricing, appellant's counsel stated: "Yeah, I mean, I think it's obvious from listening to him he knows a lot about the polysilicon industry." Therefore, the court did not abuse its discretion in determining that Mr. Winegarner was qualified to offer expert testimony concerning the reasonable price of silicon powder.

Likewise, Mr. Winegarner possessed the requisite factual basis upon which to offer this opinion. Indeed, "[a] factual basis for expert testimony may arise from a number of sources, such as facts obtained from the expert's first-hand knowledge, facts obtained from the testimony of others, and facts related to an expert through the use of hypothetical questions." *Sippio v. State*, 350 Md. 633, 653, 714 A.2d 864 (1998) (citation omitted). Moreover, "[i]t is well-settled that the trial judge—not the expert witness—determines whether there exists an adequate factual basis for the opinion at issue." *Wood v. Toyota Motor Corp.*, 134 Md.App. 512, 523, 760 A.2d 315 (2000). Further, in evaluating whether there is an adequate factual basis, the trial court operates within a wide discretionary range. *CSX Transp., Inc. v. Miller*, 159 Md. App. 123, 199, 858 A.2d 1025 (2004).

Here, appellant's argument is that Mr. Winegarner "chose to completely disregard the only hard, factual pricing data available to him: [appellant's] actual sales of silicon powder on the spot market during the precise period at issue." At trial, however, Mr. Winegarner explained that the spot market price can be significantly higher than the long-term average price. Instead, Mr. Winegarner based his opinion on a number of other permissible considerations, including interviews with individuals within the industry, pricing data presented to industry groups one year prior to his involvement in the litigation, and his estimation of a long-term contract price based on his years of experience in the industry. Therefore, considering the breadth of the trial court's discretion in evalu-

ating whether there is an adequate factual basis, the court did not abuse its discretion on this ground.

■■■■ Finally, we find no merit in appellant's argument that Mr. Winegarner's opinions were untethered to any reliable principles or methods because he had not applied any mathematical formula or other regularly accepted methodology to his analysis. Though appellant is correct in noting that an expert may not offer testimony that amounts to a " 'because I think so' or 'because I say so' " situation, *Giant Food, Inc. v. Booker,* 152 Md.App. 166, 188, 831 A.2d 481 (2003), that situation did not occur here. Rather, there is credible evidence suggesting that Mr. Winegarner's testimony was properly predicated upon an "adequate factual basis," *id.,* as described above, which "permit[ted] reasonably accurate conclusions as distinguished from mere conjecture or guess." *Id.* at 189, 831 A.2d 481. Again, while appellant may disagree with the factual basis for Mr. Winegarner's testimony, that does not render his testimony lacking in reliable principles or methods.

Thus, because our courts have consistently allowed experts to acquire expertise in a variety of ways, and because Mr. Winegarner's opinions were premised upon the requisite factual basis and reliable principles, we conclude that the trial court did not abuse its discretion in allowing him to offer expert testimony regarding the price of silicon powder.

### B. "Reasonable Price" Testimony Need Not Be Tied to Time of Delivery

■■■■ Appellant additionally argues that the trial court erred in denying its motion for judgment because the witnesses' "reasonable price" opinions for the price of silicon powder in October 2005 and 2006 were not tied to the "time for delivery" and therefore ran afoul of § 2–305 of the MD UCC.[17] Appellee counters that this issue is not preserved for

---

**17.** Section 2–305 provides:
 **Open price term.**

appeal because appellant failed to object at the time the testimony was offered or, alternatively, that § 2–305 is not controlling in light of the parties' agreement to agree on 2007 pricing during October 2006.

■ First, regarding proper objections to the admissibility of expert testimony, we have stated that:

> It is clear that the proper way of attacking an allegedly flawed expert opinion is directly by an objection to its admission and not indirectly by a vague and undifferentiated motion that the evidence is not legally sufficient to take the case to the jury, a motion coming perhaps days after the opinion was ruled admissible.

*CSX Transp.*, 159 Md.App. at 178, 858 A.2d 1025 (internal quotations omitted). Moreover, "once an expert opinion has been received in evidence, one may not seek to avoid its impact by making an untimely Rule 5–702 admissibility challenge under the guise of a Rule 2–519 motion for judgment based on the legal insufficiency of the plaintiff's case." *Terumo Med. Corp. v. Greenway*, 171 Md.App. 617, 630, 911 A.2d 888 (2006).

---

(1) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if

(a) Nothing is said as to price; or

(b) The price is left to be agreed by the parties and they fail to agree; or

(c) The price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.

(2) A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.

(3) When a price left to be fixed otherwise than by agreement of the parties fails to be fixed through fault of one party the other may at his option treat the contract as cancelled or himself fix a reasonable price.

(4) Where, however, the parties intend not to be bound unless the price be fixed or agreed and it is not fixed or agreed there is no contract. In such a case the buyer must return any goods already received or if unable so to do must pay their reasonable value at the time of delivery and the seller must return any portion of the price paid on account.

Here, the record reveals that appellant's only objection to Mr. Winegarner's "reasonable price" opinions concerned his general inability to testify as to price, for reasons previously discussed. Indeed, appellant sought and was granted a continuing objection on this ground during Mr. Winegarner's testimony regarding the reasonable price of powder as of October 2005 and 2006. However, appellant never raised an additional objection on the ground that this testimony was inadmissible as it was not tied to the time for delivery under § 2–305 of the MD UCC. Consequently, this argument is not preserved.

■■■ Assuming this argument is preserved, we reject it on the merits. Appellant contends that because the parties never agreed on price, § 2–305(1)(b) requires that the price amount to a reasonable price at the "time for delivery." Therefore, appellant argues, it was impermissible for Mr. Winegarner to "focus[ ] exclusively on the preceding October in fixing an annual price, and completely ignore[ ] what the price might be on *any* date of delivery [in 2007], much less all of them." (Emphasis in original). Similarly, appellant argues that Mr. Winegarner's testimony failed to account for evidence at trial allegedly establishing that the price for silicon powder rose during 2006 and 2007, and could therefore materially differ at the various "times for delivery" in 2007.

■■■ However, as is true elsewhere, much of appellant's argument rests on its view of the facts, a view on which Mr. Winegarner was not required to base his testimony. Expert witnesses are free to express opinions on facts in dispute, assuming there is evidence of those facts. *Hall v. State,* 107 Md.App. 684, 693, 670 A.2d 962 (1996) ("... judges and lawyers [must] be alert to the distinction between the expert opinion that *assumes* the truthfulness of disputed testimony, and the expert opinion that *asserts* that the testimony is true. The former is admissible. The latter is not.") (Emphasis in original). Here, there was evidence of an output contract, and therefore, Mr. Winegarner could express an opinion about the long-term reasonable price of silicon powder, assuming the

existence of an output contract. Furthermore, based on the e-mails and other testimony, he could also assume that the contract price for the entire year 2007 was to be determined in October 2006. Consequently, Mr. Winegarner was free to opine that the reasonable price of silicon powder in October 2006 was between $7.00 and $8.00 per kilogram.

 Section 2–305 serves as a gap-filler, *Havird Oil Co. v. Marathon Oil Co.*, 149 F.3d 283, 290 (4th Cir.1998), not to trump the existence of an agreement between the parties. Although the parties, in October 2006, failed to agree on a price for 2007 shipments, there was evidence, based on the e-mails, that the parties agreed to determine a singular price point for the powder as of October 2006, to be used for shipments in 2007. Similarly, there was evidence supporting a factual conclusion that a term of the contract was that the price for 2007 would be the same throughout the year. To the extent the parties reached agreement with respect to pricing, i.e., it would be set in October for the following year, that agreement trumps § 2–305. Thus, the jury, having found that the parties formed a contract, was free to accept Mr. Winegarner's reasonable price determination as of October 2006, for all 2007 shipments, in fashioning its damages award.

It must also be noted that the court instructed the jury with respect to the issue of price as of the time of delivery. Additionally, appellant's counsel argued this point to the jury. Evidently, the jury rejected that argument.

For these reasons, the court did not err in denying appellant's motion for judgment on this basis.

### C. There Was a Sufficient Factual Basis to Support Jury's Damages Award

Finally, appellant contends that because Mr. Winegarner's opinions were based on an assumed output contract, and because the court's response to the jury "freed" the jury to find a general contract, the jury was ultimately left without any evidence to support an award if they were to find a

general contract. Thus, according to appellant, the award "must be vacated."

We note, initially, that in asserting this argument, appellant fails to identify precisely how the court erred. There is no indication in the record that appellant objected to Mr. Winegarner's testimony on this basis, moved for judgment on this basis, or requested post verdict relief on this basis.

Briefly addressing the argument in the abstract, we have already determined that the court did not err in responding to the jury's note. We have also already discussed that the jury was instructed on the general law of contracts, including specific instructions regarding output contracts, if they so found. Furthermore, the record reveals sufficient evidence to support the jury's findings regarding liability and damages. Contrary to appellant's belief, the jury's award was not based on pure speculation, and we find no error in this regard.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**